

**No. 25-20567**

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

CODY ALLEMOND,

Plaintiff-Appellant,

v.

TALOS QN EXPLORATION, L.L.C.;

QUARTERNORTH ENERGY, L.L.C.,

Defendants-Appellees.

On Appeal from the United States District Court

for the Southern District of Texas, Houston Division

Civil Action No. H-24-2560

The Honorable Sim Lake, Senior United States District Judge

**REPLY BRIEF OF APPELLANT CODY ALLEMOND**

Cody Allemond, Pro Se

125 Greenfield Dr

Carencro, LA 70520

337-290-9279

codyallemond798@gmail.com

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellant:**

Cody Allemond, Pro Se

**Defendants-Appellees:**

Talos QN Exploration, L.L.C.

QuarterNorth Energy, L.L.C.

**Counsel for Defendants-Appellees:**

James D. Bercaw, King & Jurgens, L.L.C.

Michael Stout Wright, King & Jurgens, L.L.C.

**Former Counsel for Plaintiff-Appellant (District Court):**

Marc Evan Kutner

Eric Jonathan Rhine

Patrick Brooks Tobin Jr.

Spagnoletti Law Firm

**District Court Judge:**

The Honorable Sim Lake, Senior United States District Judge

/s/ Cody Allemond

Cody Allemond, Pro Se Appellant

**TABLE OF CONTENTS**

INTRODUCTION    1

ARGUMENT    2

I.  THE FORFEITURE DOCTRINE DOES NOT BAR REVIEW OF

    THE DISTRICT COURT'S SUMMARY JUDGMENT RULING 2

II.  THE RECORD CREATES GENUINE DISPUTES ON

    QUARTERNORTH'S OPERATIONAL CONTROL   5

III. THE MOVING CONDUCTOR WAS AN UNREASONABLY

    DANGEROUS CONDITION  8

IV.  THE DISTRICT COURT'S INTERNAL CONTRADICTION

    INDEPENDENTLY WARRANTS REVERSAL13

CONCLUSION  14

CERTIFICATE OF SERVICE    15

CERTIFICATE OF COMPLIANCE    15

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........... 2, 8

*Bufkin v. Felipe's La., LLC*, 171 So.3d 851 (La. 2014) ............. 1, 8

*Celestine v. Union Oil Co. of Cal.*, 652 So.2d 1299 (La. 1995) .... 7, 8

*Coleman v. BP Expl. & Prod'n, Inc.*, 19 F.4th 720 (5th Cir. 2021) .. 5

*Coulter v. Texaco, Inc.*, 117 F.3d 909 (5th Cir. 1997) ............. 3

*Erickson v. Pardus*, 551 U.S. 89 (2007) .......................... 2

*Graham v. Amoco Oil Co.*, 21 F.3d 643 (5th Cir. 1994) ............ 5

*Indigenous Peoples of Coastal Bend v. USACE*,

   132 F.4th 872 (5th Cir. 2025) ........................ 1

*McCoy v. Liberty Mutual*, 956 So.2d 802 (La. App. 2d Cir. 2007) .. 9

*Reeves v. Sanderson Plumbing Products, Inc.*,

   530 U.S. 133 (2000) ................................... 8

*Renwick v. PNK Lake Charles LLC, 901 F.3d 605 (5th Cir. 2018) ... 10, 11*

*Warner v. Talos ERT, L.L.C., 133 F.4th 412 (5th Cir. 2025) ..... 5, 6*

**Statutes and Rules**

43 U.S.C. § 1331 et seq. (OCSLA)

La. Civ. Code arts. 2315, 2317, 2317.1, 2322, 2323

Fed. R. App. P. 32

## INTRODUCTION

QuarterNorth asks this Court to affirm summary judgment by invoking forfeiture to shield its arguments from scrutiny, by mischaracterizing the record to minimize its control over the platform, and by treating the repairman doctrine as a per se bar that the Louisiana Supreme Court has expressly rejected. The record tells a different story.

The undisputed facts show that QuarterNorth—the sole owner and operator of Vermilion 362B—directed its designated Person in Charge to secure a moving conductor pipe. That representative signed off on a single come-along as the sole restraint, conducted only a cursory visual walkthrough, and then returned to the vessel to do paperwork while Cody Allemond welded with his hood down, unable to see the pipe moving toward his hand. Additional come-alongs were available. They were not used. After the accident, the company's own investigation

recommended that two come-alongs be used in the future.

QuarterNorth's own corporate representative admitted that eliminating

the pinch point—rather than telling workers to keep their hands away

—was the safer approach.

These facts create genuine disputes of material fact on both

operational control and the unreasonably dangerous nature of the

condition. The district court erred in concluding otherwise.

**ARGUMENT**

## I. THE FORFEITURE DOCTRINE DOES NOT BAR REVIEW OF THE DISTRICT COURT'S SUMMARY JUDGMENT RULING

QuarterNorth's primary defensive strategy is not to defend the merits of the district court's ruling but to argue that Allemond forfeited the right to challenge it. Appellees' Br. at 4, 6, 8, 30, 33, 41. This argument fails for three independent reasons.

**A. QuarterNorth itself raised operational control and unreasonably dangerous in its own motion, and the district court ruled on both issues on the merits.**

The forfeiture doctrine bars appellate review of arguments "never presented to or decided by the district court." *Indigenous Peoples of Coastal Bend v. USACE*, 132 F.4th 872, 882–83 (5th Cir. 2025). That is not this case.

QuarterNorth devoted approximately five pages of its Motion for Summary Judgment to operational control. ROA.75–99. The motion's table of contents explicitly listed "QuarterNorth did not Contractually Reserve the Right to Exercise Control over the Work of its Independent Contractors" and "QuarterNorth did not Exercise Operational Control over Acadian's Work." QuarterNorth's Reply brief reiterated these arguments at ROA.777–80.

The district court analyzed operational control on the merits under Article 2315 and concluded there was no genuine issue of material fact. ROA.956–57. The court also applied the risk-utility balancing test, analyzed all four *Bufkin* factors, and concluded the moving conductor was not unreasonably dangerous. ROA.962–66.

QuarterNorth's own Reply brief at ROA.779–80 explicitly argued the unreasonably dangerous / repairman defense, citing *Ladue* and *Duffy*.

When the movant raises an issue, the court rules on it, and the nonmovant receives an adverse ruling, the nonmovant is entitled to appeal that ruling. Forfeiture applies when an issue was never before the court. It does not apply when the court affirmatively decided the issue on the merits—which is exactly what happened here.

**B. Allemond's counsel did respond on premises liability.**

QuarterNorth's own brief acknowledges that Allemond's counsel argued premises liability under Articles 2317, 2317.1, and 2322 at ROA.297–300. Appellees' Br. at 4. Counsel argued custody, knowledge of the dangerous condition, breach of duty, and causation. That counsel chose to frame the argument under premises liability rather than operational control does not constitute "forfeiture"—it reflects a

strategic choice about which legal theory to emphasize. The underlying evidence—the depositions, safety documents, and MSAs—was before the court regardless of the legal label counsel attached to it.

**C. This Court reviews summary judgment de novo, and pro se briefs are liberally construed.**

On de novo review, this Court examines "whether the district court correctly applied the substantive law" and "whether there are any genuine disputes of material fact." The standard of review does not change because counsel below chose a different legal theory. The evidence is in the record. The question on appeal is whether that evidence, viewed in the light most favorable to Allemond, creates genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Moreover, pro se briefs are to be "liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Even if this Court were to find some arguable forfeiture, it retains discretion to review for plain error—a standard that is satisfied here given the strength of the record evidence.

Finally, QuarterNorth's accusation that Allemond's opening brief was "generated primarily by Artificial Intelligence" (Appellees' Br. at iv, 23) is an ad hominem attack unsupported by evidence. The Fifth Circuit permits AI-assisted briefing so long as the signer reviews for accuracy. QuarterNorth's own brief contains citation errors—including citing "*Coulter*, 117 F.**2d** at 912" when the correct reporter is F.3d, and citing inconsistent ROA pages for the same deposition testimony (compare Appellees' Br. at 10 (ROA.459, ROA.462) with id. at 22 (ROA.455, ROA.461)). Citation errors are not evidence of AI generation.

## II. THE RECORD CREATES GENUINE DISPUTES ON QUARTERNORTH'S OPERATIONAL CONTROL

QuarterNorth argues it is insulated from liability because Acadian and FCG were independent contractors and QuarterNorth did not exercise operational control. Appellees' Br. at 28–37. Viewing the evidence in the light most favorable to Allemond, genuine disputes of material fact preclude summary judgment.

### A. Daw functioned as QuarterNorth's on-site representative, not merely an independent contractor doing his own work.

Daw was the sole Person in Charge and sole holder of Ultimate Work Authority on VR 362B. ROA.146, ROA.148–49, ROA.215. He reported directly and daily to QuarterNorth's project manager Scotty Godchaux—his sole point of contact at QuarterNorth. Daw Depo. p.16

ln.12–25; p.17 ln.5–9. His duties were to "orchestrate the work or the tasks for the day as directed by the project manager." ROA.182–83. When Daw noticed the conductor moving, the chain of command ran straight through QuarterNorth: Daw reported it to Godchaux; Godchaux directed Daw to secure it; Daw instructed Ohlin to secure it. Daw Depo. p.123 ln.15–21; p.128 ln.8–15.

Critically, Daw confirmed that "that instruction didn't come from FCG. That came from QuarterNorth, correct, Scotty Godchaux?" Answer: "Correct." Daw Depo. p.128 ln.12–15. FCG had no ownership interest in the platform, did not own it, and did not operate it. Cole Depo. p.28 ln.3–9. While the MSA language designated FCG as an independent contractor (ROA.252), the functional reality—viewing the facts in the light most favorable to Allemond—is that Daw performed QuarterNorth's regulatory obligations and acted on QuarterNorth's specific instructions.

**B. Daw exercised supervisory authority that went beyond "result-oriented" control.**

QuarterNorth characterizes Daw's role as limited to directing the "what" but not the "how." Appellees' Br. at 32–33. The record evidence, viewed favorably to Allemond, tells a different story:

- Daw signed the JSA as Ultimate Work Authority / PIC. ROA.265–72. Cole confirmed this meant Daw's "overall responsibility . . . was to review and authorize the work to commence." Cole Depo. p.66 ln.2–4.

- QuarterNorth expected Daw to "reject this JSA document if he found that it did not adequately identify mitigation measures to eliminate known hazards." Cole Depo. p.94 ln.6–11. No hot work permit was to be issued "until the JSA was corrected." Cole Depo. p.94 ln.13–16.

- Daw conducted the required walk-through of the worksite pursuant to QuarterNorth's PIC responsibilities policy. Daw Depo. p.71 ln.3–14; p.129 ln.5–11.

- Daw had stop-work authority, and "if you say stop, the Acadian contractors are supposed to stop." Daw Depo. p.131 ln.5–7. Had Daw raised a concern about the conductor's securing, "there at least would have been a conversation about how to better secure it." Daw Depo. p.132 ln.5–10.

- Daw had "greater authority" than any worker on the platform "from a safety perspective." Daw Depo. p.127 ln.16–20; p.128 ln.1.

- Daw affirmatively inquired about the safety plan—asking Ohlin "How are you going to go about securing the conductor?"—and then approved it: "Roger. Sounds good." ROA.187–88. This was not passive disinterest. It was an exercise of supervisory authority by QuarterNorth's designated representative.

A reasonable jury could find that this constellation of facts—daily reporting to QuarterNorth, acting on QuarterNorth's specific directive, signing off on the safety plan, conducting walkthroughs, and possessing authority to stop work and require changes—constitutes operational control sufficient to impose liability. At minimum, these facts create genuine disputes that preclude summary judgment.

## C. *Warner v. Talos* is directly on point and not distinguishable.

The doctrinal framework is well established. Under *Graham v. Amoco Oil Co.*, 21 F.3d 643, 647–48 (5th Cir. 1994), a principal normally has no duty to ensure the safety of its independent contractors—but it may assume such a duty by contract or by voluntarily and affirmatively going beyond the contract. *Coleman v. BP Expl. & Prod'n, Inc.*, 19 F.4th 720, 733–34 (5th Cir. 2021), refined this framework: where a platform owner's safety manual is incorporated into the SEMS Bridging

Agreement, which is incorporated into the MSA, the owner may assume a duty to ensure contractor safety through those safety procedures. Here, QuarterNorth's safety protocols, the HSE Management Report, and the JSA followed precisely this contractual chain.

In *Warner v. Talos ERT, L.L.C.*, 133 F.4th 412 (5th Cir. 2025), this Court found sufficient evidence to support a jury verdict that Talos "authorized the unsafe work practice that led to [the decedent's] death." Id. at 426. QuarterNorth attempts to distinguish *Warner* on the ground that (1) it was a post-trial appeal and (2) a Talos employee signed the JSA. Appellees' Br. at 34–36.

Neither distinction holds. First, the relevant question at summary judgment is whether the evidence could support a jury finding—and *Warner* demonstrates that similar evidence can and does support such a finding. Second, here, as in *Warner*, the platform owner's designated representative signed the JSA as the person with ultimate authority

over the work. The distinction that Daw was technically FCG's employee rather than a W-2 QuarterNorth employee is formalistic. Daw performed the identical function as the Talos employee in *Warner*: he was the owner's on-site authority who reviewed and approved the safety plan.

The parallels are striking. In both cases: the platform owner designated an on-site representative who signed the JSA; that representative had authority to approve or reject the safety plan; the work was performed by an independent contractor's employees; and the principal directed what needed to be done. *Warner* held that the JSA form was a "master control document for all authorized work." 133 F.4th at 420. Here, the Acadian HSE Management Report served the same function—it was the document that governed the scope, hazards, and controls for the work, and it required Daw's sign-off before work could begin.

## III. THE MOVING CONDUCTOR WAS AN UNREASONABLY DANGEROUS CONDITION

QuarterNorth argues the conductor, after being secured with a single come-along, was not unreasonably dangerous vis-à-vis Allemond because he was an experienced repairman who was warned about pinch points. Appellees' Br. at 39–53. Under the correct legal framework, genuine disputes of material fact preclude summary judgment.

**A. *Celestine* requires a factor-by-factor analysis, not a repairman bar.**

*Celestine v. Union Oil Co. of Cal.*, 652 So.2d 1299 (La. 1995), holds that repairman status is one factor in the risk-utility analysis—"not a per se rule." Id. at 1304. The Louisiana Supreme Court instructed courts to consider "the individual circumstances, including but not

limited to the social, moral, economic considerations, the degree of knowledge of the repairman, the incentive or disincentive to the owner to repair the defect, the reasonableness of presuming that a particular repairman is cognizant of particular risks, and the ability of the repairman to minimize such risks." Id.

The district court acknowledged that repairman status was "a significant factor" but "not dispositive." ROA.962, ROA.964. Yet the court effectively treated it as dispositive by granting summary judgment based primarily on Allemond's experience and the generic warnings about pinch points. This approach collapses the multi-factor analysis into a single-factor determination, contrary to *Celestine* and *Bufkin v. Felipe's La., LLC*, 171 So.3d 851, 856 (La. 2014).

**B. The district court improperly weighed evidence and made credibility determinations.**

At summary judgment, the court "must view all facts and draw all reasonable inferences in [the nonmovant's] favor" and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). The district court's ruling did precisely this.

The court credited QuarterNorth's characterization of the warnings as sufficient without considering Allemond's testimony that he did not read the HSE Report before signing it (Allemond Depo. p.59 ln.19–22), did not recall what was discussed about pinch points (Allemond Depo. p.63 ln.20–22), and was simply told "the job was ready for me to weld, and I started to weld" (Allemond Depo. p.75 ln.10–11). Whether generic boilerplate about "keep fingers out of pinch points" constitutes adequate warning about the specific risk that a come-along might fail to restrain a moving conductor during welding is a factual question for the jury.

Similarly, the court credited QuarterNorth's characterization that Allemond had "adequate space" for his left hand (relying on Daw's testimony at ROA.196), while Allemond testified he "had to get in those positions. There's no way not to." Allemond Depo. p.87 ln.2–5. Daw was not on the platform at the time of the accident—he was on the vessel doing reports (Daw Depo. p.74 ln.12–19)—and his assessment of available workspace is not entitled to uncritical acceptance over Allemond's firsthand account.

**C. The come-along was inadequate, and additional restraints were available and feasible.**

The come-along demonstrably failed to prevent conductor movement. This is not an "inference" of defect from the occurrence of an accident. Cf. *McCoy v. Liberty Mutual*, 956 So.2d 802, 806 (La. App. 2d

Cir. 2007). It is an established fact: the conductor moved despite the come-along and crushed Allemond's finger.

The record establishes that additional come-alongs were available. Daw confirmed: "Come-alongs were available." Daw Depo. p.80 ln.16–21. QuarterNorth's corporate representative Cole confirmed that using a second come-along was "economically feasible" (Cole Depo. p.88 ln.1–3), that there was nothing "unsafe" about using a second come-along (Cole Depo. p.88 ln.9–16), and that there was no reason it "couldn't have been done before Mr. Allemond got hurt" (Cole Depo. p.83 ln.2–4).

The post-incident investigation itself recommended that "moving/potentially moving objects should be secured with at least 2 means of directional pull. For example, Two come a longs, from different angles creating stabilization." Daw Depo. p.77 ln.15–22; Cole Depo. p.82 ln.3–9. Cole confirmed this recommendation. Cole Depo. p.82 ln.10–17. If two come-alongs were the recommended practice after the accident, a

reasonable jury could find that using only one before the accident was inadequate.

## D. QuarterNorth's own corporate representative admitted that eliminating the hazard was safer than relying on warnings.

Cole testified that "the safer, more effective means of avoiding an injury from a pinch point would be from eliminating the pinch point." Cole Depo. p.73 ln.15–19. He agreed that "no matter how many times the JSA form says to keep your hands out of pinch points, the safer way of eliminating that—of dealing with that hazard would be to eliminate the hazard by restricting the movement of the conductor if that was possible." Cole Depo. p.113 ln.25–p.114 ln.6.

This testimony directly undermines the district court's reliance on generic pinch-point warnings as a basis for summary judgment. Under OSHA's recognized hierarchy of controls—a framework widely applied

in offshore safety—engineering controls (physically eliminating or isolating the hazard) take precedence over administrative controls (warnings, training, and procedures). The single come-along was an engineering control that failed. Additional come-alongs were an available and feasible engineering upgrade. Instead, QuarterNorth relied on administrative controls: telling workers to keep their hands out of pinch points. Cole's own admissions confirm that the engineering solution was both safer and economically feasible, yet it was not implemented. When the platform owner's own corporate representative concedes that the safer approach was not taken, a reasonable jury could find that constitutes an unreasonably dangerous condition.

**E. Allemond's knowledge goes to comparative fault, not summary judgment.**

QuarterNorth emphasizes Allemond's experience, his signing of the JSA, and his general awareness of pinch points. But *Renwick v. PNK Lake Charles LLC*, 901 F.3d 605, 617 (5th Cir. 2018), holds that a plaintiff's knowledge and awareness of a hazard go to comparative fault—which is a question for the jury—not to whether the condition is unreasonably dangerous as a matter of law.

QuarterNorth tries to cabin *Renwick* to Factor 2. Appellees' Br. at 49, 52–53. But *Renwick*'s principle—that the plaintiff's subjective awareness does not eliminate the owner's duty as a matter of law—applies across the risk-utility analysis. Allemond may bear some comparative fault for his hand placement. But comparative fault is governed by Louisiana Civil Code Article 2323 and is for the jury to allocate, not the court to determine at summary judgment.

Moreover, Allemond was not warned about the specific risk that materialized. He was told to keep fingers out of pinch points generally. He was not told that the come-along might fail to hold the conductor

while he welded with his hood down, unable to see. He testified he "was told that the job was ready for me to weld, and I started to weld." Allemond Depo. p.75 ln.10–11. QuarterNorth's "seven warnings" argument collapses under scrutiny: every one of those warnings is a generic admonition about pinch points during rigging operations. Not one addresses the specific hazard that a single come-along restraining a moving conductor might fail during active welding—a fundamentally different operation where the welder's hood eliminates his ability to see the pipe moving toward his hand. The question is not whether Allemond generally knew about pinch points. The question is whether he was warned that the sole mechanical restraint on a moving conductor might be insufficient. He was not. That distinction is for the jury.

# IV. THE DISTRICT COURT'S INTERNAL CONTRADICTION INDEPENDENTLY WARRANTS REVERSAL

The district court's own analysis reveals an internal contradiction that independently warrants reversal.

On the custody question under Articles 2317/2317.1, Judge Lake found a genuine issue of material fact as to whether QuarterNorth had custody of the platform. ROA.959–61. The court relied on the following evidence: (1) defendants received daily reports about the platform; (2) defendants required specific safety protocols; (3) defendants did not clearly contract out inspection and maintenance duties; and (4) Daw described his job as being "the eyes and ears" of Godchaux. ROA.959–61.

But the court then found no genuine issue on operational control or on whether the conductor was unreasonably dangerous. This is logically inconsistent. The same evidence that creates a genuine issue

on custody—QuarterNorth's involvement through Daw, their safety protocols, their daily direction—should also create genuine issues on operational control and on the adequacy of the safety measures taken. The court cannot logically find sufficient QuarterNorth involvement for one analysis but insufficient involvement for another when the analyses rest on overlapping facts.

If Daw's role as QuarterNorth's "eyes and ears" on the platform creates a genuine issue on custody, then Daw's approval of the safety plan, his walkthrough, his stop-work authority, and his daily reporting to Godchaux should create at minimum a genuine issue on operational control.

# CONCLUSION

The district court erred in granting summary judgment. The record, viewed in the light most favorable to Allemond, creates genuine disputes of material fact on both operational control and the unreasonably dangerous nature of the moving conductor. QuarterNorth's forfeiture argument is meritless because QuarterNorth itself raised these issues below and the district court ruled on them. Allemond respectfully requests that this Court reverse the district court's judgment and remand this case for trial.

Respectfully submitted,

/s/ Cody Allemond

Cody Allemond, Pro Se

Plaintiff-Appellant

Date: March 28, 2026

## CERTIFICATE OF SERVICE

I certify that on March 28, 2026, a true and correct copy of this

Reply Brief was served via electronic mail on all counsel of record:

James D. Bercaw

jbercaw@kingjurgens.com

Michael Stout Wright

michael@wright-lawfirm.com

King & Jurgens, L.L.C.

201 Saint Charles Avenue, 45th Floor

New Orleans, Louisiana 70170

Counsel for Defendants-Appellees

/s/ Cody Allemond

Cody Allemond

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains **3,220** words, excluding the parts exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Century Schoolbook in 14-point font.

/s/ Cody Allemond

Cody Allemond